80 A.3d 415

**COMMONWEALTH of Pennsylvania, Appellant/Cross–Appellee**

**v.**

**Joseph ELLIOTT, Appellee/Cross–Appellant.**

Supreme Court of Pennsylvania.

Submitted June 20, 2012.

Decided Nov. 21, 2013.

238

240

242

Amy Zapp, Esq., PA Office of Attorney General, Harrisburg, Hugh J. Burns Jr., Esq., Philadelphia, for Commonwealth of Pennsylvania in Nos. 612 CAP and 624 CAP.

Stuart Brian Lev, Esq., Defender Association of Philadelphia, for Joseph A. Elliot in Nos. 612 CAP and 624 CAP.

Aren Kevork Adjoian, Esq., Federal Community Defender Office for the Eastern District of Pennsylvania, Cristi A. Charpentier, Esq., for Joseph A. Elliot in No. 624 CAP.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.

## *OPINION*

Justice BAER.

In 1994, Joseph Elliott was convicted of the first degree murder of Kimberly Griffith, and sentenced to death. Following the denial of relief on direct appeal, Elliott filed a petition for collateral relief pursuant to the Post–Conviction Relief Act, 42 Pa.C.S. §§ 9541–9546. Without holding an evidentiary hearing, the Court of Common Pleas of Philadelphia County ("the PCRA court") granted Elliott a new trial on the following grounds: (1) that trial counsel was ineffective for failing to prepare for trial or interview Elliott in person prior to trial; and (2) that trial counsel was ineffective for failing to object to the medical examiner's testimony regarding the estimated time of the victim's death.[1] The PCRA court denied Elliott

---

1. The PCRA court likewise found Elliott's appellate counsel ineffective for failing to preserve these issues on direct appeal. Notably, Elliott's

relief on his remaining claims. The Commonwealth has filed an appeal from the PCRA court's grant of a new trial, and Elliott has filed a cross-appeal from the denial of relief on his other issues. For the reasons set forth herein, we reverse the grant of a new trial, and affirm the denial of relief on Elliott's remaining claims.

The facts underlying Elliott's conviction are set forth in this Court's opinion affirming his judgment of sentence on direct appeal. *Commonwealth v. Elliott,* 549 Pa. 132, 700 A.2d 1243 (1997). To facilitate an understanding of the issues raised, we reiterate those facts necessary to disposition of the matter before us. On May 7, 1992, Elliott, who is African–American, and Frank Nardone socialized with Kimberly Griffith ("the victim"), who is Caucasian, at an after-hours nightclub in Philadelphia.[2] At around 4:00 a.m., the victim left the club with Elliott and Nardone, and proceeded to Nardone's house. While there, Elliott and the victim ingested cocaine, and Nardone, who was intoxicated, passed out. Nardone awoke that afternoon at 1:30 p.m., and discovered the victim's battered dead body lying on the couch, having been raped, beaten and strangled by an electrical cord.

Nardone notified the police, who questioned Elliott later that day. Elliott explained that he had consensual sex with the victim in the early hours of the morning, and had left Nardone's home while the victim was alive. During the interview, police observed and photographed several scratch marks on Elliott's arms and body and a discolored bruise in the pattern of a straight line on the back of his right hand, which suggested that an item may have been wrapped tightly around it. Elliott indicated that the victim made one of the scratch marks during sexual intercourse, and did not explain the others. It was not until more than a year later, after

trial occurred prior to this Court's decision in *Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726, 738 (2002), which announced the general rule deferring ineffectiveness claims to collateral review.

2. The race of the perpetrator and the victim is relevant in this case as it is used by the Commonwealth to introduce evidence of Elliott's prior bad acts pursuant to the common scheme, plan or design exception to the general rules of evidence excluding evidence of prior crimes.

Elliott was suspected of committing sexual assaults on other young white women, that he was arrested in connection with the instant murder.

Elliott's trial commenced in October of 1994, with the Honorable Paul Ribner presiding and Benjamin Paul, Esquire ("trial counsel"), representing Elliott. Prior to *voir dire*, Elliott informed the court that he questioned trial counsel's ability to represent him because counsel did not communicate with him or otherwise discuss the case with him until earlier that day in the holding cell. Notes of Testimony ("N.T."), dated Oct. 18, 1994, at 34–35. When the court then asked trial counsel whether he had spoken to Elliott about the capital murder case, counsel responded:

> I represent the Defendant in four other cases, one which I tried already. I did talk to the Defendant about this case in the cell room. It's true that I never visited him in prison. Judge Temin has knowledge of that. I was fully satisfied in my mind that there was nothing else to be discussed with the Defendant with respect to the defense. I did investigate the case thoroughly. I do have the Defendant's statement, which I reviewed thoroughly. He has reviewed it thoroughly. If there is anything he can add, he can tell me. I mean, just to go to the prison to hold his hand and discuss the case may not be proper.

*Id.* at 37–38. The court thereafter advised trial counsel to consult with Elliott concerning the case, denied Elliott's request for the appointment of new counsel, *id.* at 51, and proceeded with *voir dire*.

At trial, to demonstrate the events leading up to the murder and the discovery of the victim's body, the Commonwealth presented the preliminary hearing testimony of Nardone, who had died after the preliminary hearing, but before Elliott's trial. Further, the Commonwealth presented the testimony of the medical examiner who had performed an autopsy on the victim's body. The medical examiner testified that the victim had been beaten and ultimately strangled by an electrical cord; that the victim had injuries to her vagina and anus, indicative of forced sexual penetration; and that the victim

had survived for thirty to sixty minutes after the attack. Additionally, the medical examiner opined that analysis of the sperm recovered from the victim's vagina demonstrated that Elliott could have been the source, but that Nardone could not have been the source of the sperm.

Over trial counsel's repeated objections, the Commonwealth also presented evidence of Elliott's prior bad acts to demonstrate a common scheme, plan or design. Specifically, the Commonwealth presented the testimony of Lynn Cardinal, Barbara Gogos, and Iris Berson, all Caucasian women in their twenties, who testified that they had been physically and/or sexually assaulted by Elliott in separate, unrelated incidents occurring within several months of the instant murder. At the time of the trial in this case, Elliott had been convicted of indecent assault in the Cardinal matter; had been charged with assaulting Berson, but trial had not yet occurred; and had not yet been criminally charged with assaulting Gogos. Approximately one month before this trial commenced, trial counsel had represented Elliott at the Cardinal assault trial, during which evidence of Elliott's assaults on Gogos and Berson had been admitted over trial counsel's objection. *Commonwealth v. Elliott*, 700 A.2d at 1249 (citing N.T., Oct. 24, 1994, at 20–22).

Notwithstanding that trial counsel indisputably had knowledge of Elliott's previous assaults on Cardinal, Gogos and Berson as a result of his prior representation of Elliott, as explained *infra*, counsel repeatedly asserted during the instant murder trial that he was unprepared to respond to the Commonwealth's presentation of this prior bad acts evidence because the Commonwealth failed to provide sufficient notice of its intent to present the same. Trial counsel requested a 30–60 day continuance, which the trial court denied.

Notwithstanding trial counsel's self-proclaimed lack of preparedness to respond to the prior bad acts evidence, he vigorously cross-examined the three women, scrutinizing their prior statements, and called a medical expert to rebut Berson's testimony. As discussed *infra*, the trial court expressed frustration with both the Commonwealth's and trial counsel's

pre-trial handling of the evidence relating to Elliott's prior bad acts.[3]

In defense, Elliott testified at trial on his own behalf, reiterating that he had consensual sex with the victim after Nardone had fallen asleep, and that he "guessed" that he left Nardone's home at approximately 10:00 a.m., while the victim was still alive. Significantly, the Commonwealth called the medical examiner to testify on rebuttal that, based on her investigator's notes regarding lividity of the body, she estimated the time of death between 5:00 a.m. and 9:00 a.m. On cross-examination, the medical examiner conceded that the victim could have died as late as 10:00 a.m. Elliott testified on redirect that he was unsure when he had left Nardone's residence on the morning of the murder.

Following the jury trial, on October 28, 1994, Elliott was convicted of first degree murder, rape, and involuntary deviate sexual intercourse. At the conclusion of the penalty hearing, the jury returned a verdict of death, finding two aggravating circumstances, that the killing was committed during the perpetration of a felony and by means of torture, 42 Pa.C.S. §§ 9711(d)(6), (8), and no mitigating circumstances. Trial counsel withdrew, new counsel was appointed, and filed post-trial motions, which were denied.

Elliott thereafter filed a direct appeal with this Court. Therein, Elliott challenged, *inter alia,* the sufficiency of the evidence; the admission of evidence of his prior bad acts; the admission of Nardone's preliminary hearing testimony; and the admission of photos of the victim taken at the crime scene. Appellant also challenged the admission of the medical examiner's opinion on the approximate time of death based on the

---

**3.** *See* N.T., Oct. 25, 1994, at 29 (where the trial court stated, "In the event of a conviction here, the defendant might have a good argument about the preparation of this case.... He may also have some complaints about the lack of discovery furnished by the prosecution"); *id.* at 30 (where the trial court stated, "[t]he prosecution didn't turn over this information. I don't see where defense counsel even requested it."); *id.* at 39 (where the trial court stated, "when you are dealing with a capital case, there should be a little bit more care on the part of both the prosecution and the defense in preparing the case").

results of a lividity test performed by someone other than the medical examiner. Finally, Appellant raised claims of prosecutorial misconduct and challenged the sufficiency of the evidence supporting the two aggravating factors. This Court rejected each of these claims, and affirmed Elliott's judgment of sentence. *Commonwealth v. Elliott, supra.* The United States Supreme Court denied certiorari on June 26, 1998. *Elliott v. Pennsylvania,* 524 U.S. 955, 118 S.Ct. 2375, 141 L.Ed.2d 742 (1998).

On July 28, 1998, Elliott filed a petition for collateral relief pursuant to the PCRA. Counsel was appointed and filed an amended petition on June 4, 1999 ("1999 amended petition"). Therein, Elliott raised 39 issues, including that trial counsel was ineffective for failing to investigate the evidence of prior bad acts admitted against Elliott. Within his argument on that claim, Elliott noted trial counsel's unpreparedness in this regard and his failure to meet with Elliott prior to trial. Elliott's 1999 Amended Petition at 3.[4] Relevant herein, Elliott also alleged that trial counsel was ineffective for failing to impeach the medical examiner's testimony at trial, claiming that the testimony as to the time of death was not supported by the available medical evidence. *Id.* at 28, 38–39. Additionally, Elliott requested an evidentiary hearing to allow for a full and fair resolution of his claims. *Id.* at 152–54.

The Commonwealth filed a motion to dismiss on September 6, 2000, which the PCRA court, per the Honorable John J. Poserina, granted in part and denied in part.[5] The case was

---

4. In a separate issue, alleging that Elliott had been "deprived of his right to effective assistance of counsel throughout trial and sentencing," Elliott relied on counsel's lack of preparedness and his failure to meet with Elliott for more than 14 minutes prior to *voir dire. Id.* at 81. In his 2009 amended petition, however, Elliott expressly withdrew this claim. *See* Elliott's 2009 Amended Petition at 110–111.

5. The only explanation of this ruling appears in the notes of testimony where Judge Poserina stated:

After listening to discussion with counsel in chambers and after reviewing the documents in the file, the motion by the Commonwealth to dismiss will be granted in part and denied in part. The granted in part relates to the ineffective assistance of counsel issue; however, on the penalty phase, the failure to produce mental health

thereafter continued several times, but no evidentiary hearing was ever conducted. The PCRA proceedings were delayed due to Elliott's claim of mental retardation in 2003, and a subsequent claim alleging lack of competency, which was resolved in 2008, after experts agreed that Elliott was competent. On March 23, 2009, more than ten years after Elliott filed his initial PCRA petition, Elliott filed an amendment to his PCRA petition ("2009 Amended Petition"), which essentially reiterated his previous claims of layered ineffectiveness, and withdrew several claims.

After Judge Poserina retired from the bench, the case was transferred to the Honorable Carolyn Temin on February 26, 2010. At that time, the Commonwealth agreed not to oppose Elliott's request for a new penalty hearing, and Elliott withdrew his claim of mental retardation. The parties proceeded to litigate only Elliott's guilt phase issues. The PCRA court heard argument on April 23, 2010, to determine whether an evidentiary hearing was required. At that proceeding, the PCRA court became aware that Elliott's trial counsel had died. Rather than issuing a definitive ruling as to whether an evidentiary hearing was required, the PCRA court permitted the parties to file supplemental briefing, and both the Commonwealth and Elliott did so.

In his 2010 Supplemental Brief, Elliot contended that he was entitled to relief on the independent ground that "counsel completely failed to communicate with his client in preparation for trial." Elliott's 2010 Supplemental Brief at 6–9. In

testimony may or may not be significant for decision of this case, therefore, I will grant the defense permission to put evidence on at a future hearing involving the mental health evidence that should have been or could have been called, but was not called at the time of trial. N.T., Sept. 22, 2000, at 2. As noted *infra*, Elliott's PCRA petition was ultimately reassigned to the Honorable Carolyn Temin. Judge Temin did not view this ruling as prohibitive of further litigation of any of Elliott's PCRA claims because Judge Poserina's comments did not identify which of the several claims of ineffectiveness were being dismissed or offer any reasoning or notice in support of its ruling. *See* PCRA Court Opinion, Oct. 13, 2010, at 3 (explaining that "[b]ecause Judge Poserina's decision on the merits was ambiguous, this Court independently investigated each of Elliott's claims"). The propriety or effect of Judge Poserina's order is not at issue in this appeal.

support thereof, Elliott cited for the first time this Court's decision in *Commonwealth v. Brooks,* 576 Pa. 332, 839 A.2d 245, 250 (2003), which, as discussed in detail *infra,* was decided several years after Elliott's trial and held that trial counsel in a capital case was ineffective when he failed to meet his client in person prior to trial. Elliott also reiterated his claim that trial counsel was ineffective for failing to challenge the medical examiner's testimony estimating the time of the victim's death. Elliott's 2010 Supplemental Brief at 14–16. Finally, Elliott again requested an evidentiary hearing.

On May 28, 2010, based on the filings of the parties and without conducting an evidentiary hearing, the PCRA court entered an order granting Elliott a new trial on: (1) the independent claim raised in Elliot's 2010 Supplemental Brief that trial counsel was ineffective for failing to prepare for trial and for failing to meet with him personally prior to trial; and (2) counsel's failure to challenge the medical examiner's testimony estimating the time of the victim's death.

The court filed an opinion pursuant to Pa.R.A.P. 1925(a) on October 13, 2010. Finding that the issue was raised generally in Elliott's Amended 1999 PCRA Petition and developed in greater detail in his 2010 Supplemental Brief, PCRA Court Opinion, Oct. 13, 2010, at 6 n.2, the PCRA court found arguable merit to the claim that counsel was ineffective for failing to prepare for trial and meet Elliott personally prior to trial. The court relied on this Court's decision in *Brooks,* and cited the trial court's comments regarding counsel's lack of preparedness in connection with the Commonwealth's presentation of prior bad acts evidence. *See* PCRA Court Opinion, Oct. 13, 2010, at 6 n.3 (citing the following two comments by the trial court judge: (1) "In the event of a conviction here, the defendant might have a good argument about the preparation of this case ... That would be up to any counsel who raises the arguments on post-conviction," N.T., Oct. 25, 1994, at 29; and (2) "I am not satisfied with the way this case was prepared.'" *Id.,* at 31). Based on *Brooks,* the court found that absent a meeting between counsel and a defendant prior to trial, there is little chance a defendant will develop a funda-

mental base for communication with his attorney to allow for the sharing of information, and the attorney will be unable to assess the client's demeanor, credibility, and overall impression on a jury.

The PCRA court further held that trial counsel lacked a reasonable basis for his actions as "it is not possible to provide a reasonable justification for defending a case without thorough preparation." PCRA Court Opinion, Oct. 13, 2010, at 7 (quoting *Brooks*, 839 A.2d at 248). Regarding the prejudice prong of the ineffectiveness standard, the PCRA court did not suggest what information a more thorough pre-trial interview would have revealed that would have altered trial counsel's performance or affected the outcome of Elliott's trial. Rather, the PCRA court concluded that Elliott was prejudiced by trial counsel's failure to interview him prior to trial because "in order to prepare a defense to a charge of murder in the first degree, it is essential that at the very least, counsel meet with his client in person to, *inter alia*, gather information from the client, evaluate the client's demeanor, and try to establish a working relationship." *Id.* (quoting *Brooks*, at 250). In so holding, the PCRA court rejected the Commonwealth's contention that trial counsel and Elliott were already familiar as counsel had previously represented Elliott in other criminal cases. The court opined that such contact was legally insufficient as Elliott and his counsel did not discuss the capital case during the prior representations.

Second, the PCRA court held that Elliott was also entitled to a new trial based on trial counsel's failure to object to the medical examiner's estimation of the victim's death as occurring between 5:00 a.m. and 9:00 a.m. The PCRA court explained that this testimony was inconsistent with the autopsy form completed by the medical examiner, which stated "unknown" in response to an inquiry as to the time of death. Thus, the PCRA court concluded that it was error for the medical examiner to testify to a time of death that was not mentioned in her report and that was speculative because it was based on her investigator's notes, which she did not possess while testifying. The court found it difficult to imag-

ine any reasonable basis for not objecting to inadmissible evidence placing Elliott at scene of the crime during the time the murder allegedly occurred. The PCRA court additionally held that Elliott was prejudiced by trial counsel's failure to object because the case against him was purely circumstantial. It opined that if the jury believed Elliott's testimony that he left at 10:00 a.m., the medical examiner's testimony that the death occurred between 5:00 a.m. and 9:00 a.m. could have been a "crucial element in the jury's decision-making." *Id.* at 11.

As developed *infra,* the PCRA court denied relief on Elliott's remaining claims, including his contention that trial counsel was ineffective for failing adequately to investigate evidence of Elliott's prior bad acts that were admitted at trial to demonstrate a common scheme, plan or design. It held that trial counsel was aware of the prior bad acts because he represented Elliott in the trials involving Iris Berson and Lynn Carlson, and received the statement of Barbara Gogos a week before she testified at Elliott's murder trial. The court found that "[b]ased on the fact that defense counsel represented Elliott in two of the prior bad act witnesses' trial, he had all of their statements, he thoroughly cross-examined each witness, and he called a separate witness to rebut Berson's testimony, trial counsel thoroughly investigated Elliott's prior bad acts." *Id.* at 12. Thus, notwithstanding the trial court's aforementioned comments regarding counsel's purported lack of preparedness in connection with the Commonwealth's presentation of evidence of Elliott's prior bad acts, the PCRA court concluded that trial counsel was not ineffective in this regard.

The Commonwealth has appealed the PCRA court's rulings granting Elliott a new trial, and Elliott has appealed the court's denial of relief on the remaining issues. We shall address the Commonwealth's appeal first because if we would affirm the PCRA court's award of relief, further review of Elliott's claims would be unnecessary. We begin with an examination of the relevant law applicable to ineffectiveness claims raised on collateral review.

To be eligible for PCRA relief, the petitioner must prove by a preponderance of the evidence that his conviction or sentence resulted from one or more of the enumerated circumstances set forth at 42 Pa.C.S. § 9543(a)(2) (including the ineffective assistance of counsel). Additionally, the petitioner must demonstrate that the issues raised in his PCRA petition have not been previously litigated or waived. *Id.* § 9543(a)(3). An issue has been previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue." *Id.* § 9544(a)(2). A PCRA claim is waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding." *Id.* § 9544(b).

It is well-settled that counsel is presumed effective, and to rebut that presumption, the PCRA petitioner must demonstrate that counsel's performance was deficient and that such deficiency prejudiced him. *Strickland v. Washington,* 466 U.S. 668, 687–91, 104 S.Ct. 2052, 80 L.Ed.2d 674, (1984). This Court has described the *Strickland* standard as tripartite by dividing the performance element into two distinct components. *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973, 975 (1987). Accordingly, to prove trial counsel ineffective, the petitioner must demonstrate that: (1) the underlying legal issue has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) the petitioner was prejudiced by counsel's act or omission. *Id.* A claim of ineffectiveness will be denied if the petitioner's evidence fails to satisfy any one of these prongs.

Regarding the reasonable basis prong of the ineffectiveness test, we will conclude that counsel's chosen strategy lacked a reasonable basis only if the petitioner proves that the alternative strategy not selected offered a potential for success substantially greater than the course actually pursued. *Commonwealth v. Koehler,* 614 Pa. 159, 36 A.3d 121, 132 (2012). To establish the prejudice prong, the petitioner must demonstrate that there is a reasonable probability that the outcome

of the proceedings would have been different but for counsel's ineffectiveness. *Id.*

To prevail on a claim of appellate counsel ineffectiveness for failure to raise an allegation of trial counsel ineffectiveness on direct appeal, a PCRA petitioner must present a "layered" claim by presenting argument as to each of the three prongs of the *Pierce* test for each layer of allegedly ineffective representation. *Commonwealth v. Paddy*, 609 Pa. 272, 15 A.3d 431, 443 (2011). To demonstrate the arguable merit prong of a derivative claim of appellate counsel ineffectiveness, the petitioner must prove that trial counsel was ineffective under the three-prong *Pierce* standard. *Paddy*, 15 A.3d at 443. If the petitioner cannot prove the underlying claim of trial counsel ineffectiveness, petitioner's derivative claim of appellate counsel ineffectiveness fails. *Id.*

In reviewing the lower court's grant of PCRA relief, this Court examines whether the PCRA court's findings of fact are supported by the record, and whether its conclusions of law are free from legal error. *Commonwealth v. Colavita*, 606 Pa. 1, 993 A.2d 874, 886 (2010). Our scope of review is limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable to the party who prevailed in the PCRA court proceeding. *Id.*

### Issue I—Commonwealth's Appeal

### Failure to Meet with Elliott or Prepare for Trial

The Commonwealth first contends that the PCRA court erred in granting Elliott relief on his claim that trial counsel was ineffective for failing to meet with him personally prior to trial or otherwise prepare for trial. It argues that such claim is both waived and meritless. The Commonwealth asserts that the issue is waived because it was never included in Elliott's PCRA petition, originally filed in 1998 and amended by counsel in 1999, and was only injected into the case in his 2010 Supplemental Brief that did not seek to amend his prior PCRA petition. The Commonwealth asserts that Elliott's last-minute presentation of a new argument was inade-

quate to properly preserve his claim. *See* 42 Pa.C.S. § 9543(a) (requiring a PCRA petitioner to "plead and prove" grounds for relief); Pa.R.Crim.P. 902(B) (providing that the "[f]ailure to state such a ground [for relief] in the [PCRA] petition shall preclude the defendant from raising that ground in any proceeding for post-conviction collateral relief").

The Commonwealth further submits that Elliott's claim of ineffectiveness is meritless because the PCRA court relied exclusively on this Court's decision in *Brooks*, which held that trial counsel was ineffective when he failed to meet with his capital client personally prior to trial. It emphasizes that *Brooks* was decided in 2003, nine years after Elliott's 1994 trial, and created a duty for capital counsel that did not previously exist, thereby constituting a new development in the case law that was unknown to both trial and appellate counsel. Thus, the Commonwealth argues that trial counsel cannot be deemed ineffective for abdicating a non-existent duty, and appellate counsel could not have been ineffective in failing to challenge trial counsel's stewardship, which, at the time, was considered to be constitutionally sufficient. *See Commonwealth v. Harvey*, 571 Pa. 533, 812 A.2d 1190, 1196–97 (2002) (holding that "it is well settled that the amount of time an attorney spends consulting with his client before trial is not, by itself, a legitimate basis for inferring the total extent of counsel's pretrial preparation, much less the adequacy of counsel's preparation") (citing *Commonwealth v. Bundy*, 491 Pa. 607, 421 A.2d 1050, 1051 (1980)). Instead, the Commonwealth maintains, a defendant seeking a new trial based on trial counsel's failure to prepare sufficiently for trial must identify issues that his counsel should have raised or beneficial information that counsel would have discovered had further pretrial conferences been held. *Harvey*, 812 A.2d at 1197.

Moreover, the Commonwealth contends, even if we decline to view the holding in *Brooks* as a departure from prior law, it is distinguishable. It emphasizes that the defendant's counsel in *Brooks* had never met him prior to trial, therefore, counsel was unaware of the defendant's demeanor, credibility, and overall impression on a jury. To the contrary, the Common-

wealth asserts, while trial counsel in the instant case had limited pretrial personal interaction with Elliott regarding the instant murder charges, counsel had recently represented him in unrelated criminal cases, and was aware of Elliott's demeanor, credibility and overall impression on a jury, and had a fundamental basis of communication and an existing working relationship with him. Finally, the Commonwealth emphasizes that neither Elliott nor the PCRA court identified any information that trial counsel would have recovered from in-person consultations that would have refuted the overwhelming evidence of his guilt.

In response, Elliott contends that the PCRA court did not err in granting him a new trial due to trial counsel's failure to meet with him personally prior to trial or otherwise prepare for trial. Initially, he argues that the claim is not waived as it was obvious on the trial record and "pervaded [his] filings and arguments below." Revised Brief of Appellee/Cross–Appellant at 13. On the merits, Elliott contends that the claim has arguable merit because trial counsel neglected to undertake even the most basic investigation of the case; did not interview Elliott prior to the day of trial; did not review the discovery material that was provided to him, particularly the statement of prior bad act witness, Barbara Gogos; did not discuss the prospect of character witnesses, the identity of which Elliott does not disclose; and did not prepare to cross-examine the Commonwealth's witnesses. Contrary to the Commonwealth's assertions, Elliott submits that communications with trial counsel that occurred during representation on other criminal cases cannot suffice to defeat his ineffectiveness claim because such contacts cannot substitute for confidential, in-person attorney-client meetings focusing on the instant murder charges.

Mirroring the PCRA court's analysis, Elliott relies on the trial court's comments acknowledging counsel's purported failure to prepare for the Commonwealth's presentation of prior bad acts evidence. *See* N.T., Oct. 25, 1994, at 30 (noting that trial counsel may not have requested in discovery the prior bad act witnesses' statements); N.T., Oct. 25, 1994, at 29

("[Elliott] might have a good argument about the preparation of this case. He also may have some complaints about the lack of discovery furnished by the prosecution."); N.T., Oct. 25, 1994, at 31 ("I am not satisfied with the way this case was prepared.").

To demonstrate a failure to prepare for trial generally, Elliott also relies on trial counsel's own protestations of unpreparedness, specifically relating to counsel's ability to respond to the Commonwealth's presentation of prior bad acts evidence. *See e.g.* N.T., Oct. 18, 1994, at 8 (where trial counsel stated that if prior incidents of Elliott's conduct comes into evidence to demonstrate scheme, plan, and design, "I am not prepared to proceed with this trial, since there is new information in there which I would have to investigate"); N.T., Oct. 19, 1994, at 34 (where trial counsel stated that "should you admit these five incidents [of prior bad acts], I have a big problem with that because I would need to do more investigation that [sic] I am prepared to do right now, and it would take me about 30 to 60 days to do the investigation"); N.T., Oct. 25, 1994, at 5 ("I am not prepared to meet [the Commonwealth's presentation of bad acts evidence] on behalf of the defendant. I have no investigation"); *see also id.* at 40 (where trial counsel informs the court that he did not have time to review the statement of prior bad act witness Gogos).

Regarding the second prong of the ineffectiveness test, Elliott maintains that counsel lacked a reasonable basis for failing to prepare, and that his neglect was not based upon any strategic decision. Finally, in an effort to demonstrate prejudice, Elliott argues that had trial counsel prepared for trial by engaging him in an exhaustive pre-trial conversation: (1) counsel would have realized the significance of the time of death evidence, and interviewed the medical examiner so that he could challenge her time-of-death calculation with rebuttal testimony, as discussed in Issue II, *infra;* (2) counsel would have learned that Elliott left Nardone's apartment while the victim was still alive (albeit Elliott indicated the same in his statement that trial counsel had reviewed); and (3) counsel could have investigated unidentified forensic evidence to sup-

port his defense theory that he left before the victim was murdered.

Additionally, Elliott argues that the PCRA court properly based its grant of relief on this Court's decision in *Brooks*, which found trial counsel ineffective for failing to meet personally with the defendant prior to his capital trial. He refutes the Commonwealth's argument that *Brooks* is inapplicable because it was decided after his trial concluded. According to Elliott, the *Brooks* decision did not constitute a new legal development, but rather was an application of the long-established ineffective assistance of counsel standard set forth in *Strickland* and *Pierce, supra.* Elliott further contends that trial counsel's performance is akin to the level of preparation at issue in *Commonwealth v. Perry,* 537 Pa. 385, 644 A.2d 705 (1994), where we held that trial counsel was ineffective for failing to interview the defendant prior to trial or otherwise prepare for trial, failing to use his investigators, failing to recognize that he was trying a capital case, and failing to prepare for the penalty phase of trial.

We first entertain the Commonwealth's allegation that the instant claim is waived. While Elliott referenced trial counsel's unpreparedness for trial in his 1999 amended petition, the precise issue presented was that trial counsel was ineffective for failing to investigate evidence of Elliott's prior bad acts. Elliott did not raise the independent claim that he was entitled to a new trial as a result of trial counsel's failure to meet with him personally prior to trial. Subsequent to 2003, this claim would be premised upon *Commonwealth v. Brooks,* 576 Pa. 332, 839 A.2d 245 (2003). Obviously, in 1999 when Elliott filed his amended petition, *Brooks* had not yet been decided. However, in 2008, five years post-*Brooks,* the PCRA court granted Elliott permission to again amend his PCRA petition, and in 2009 Elliott did so. Elliot, however, did not reference our *Brooks* decision in his 2009 amended petition, and did not include a claim based on trial counsel's ineffectiveness for failing to meet with him personally prior to trial.

Elliott did not thereafter seek permission to amend his PCRA petition for purposes of raising any new claim. By

order dated April 23, 2010, the PCRA court permitted the parties to file written submissions in support of the claims that remained, after the Commonwealth agreed not to oppose Elliott's request for a new penalty hearing and Elliott agreed to withdraw his claim of mental retardation. The PCRA court did not authorize the parties to raise new issues in the written submissions filed in support of the already established claims. Nevertheless, Elliott raised for the first time in his 2010 Supplemental Brief the discrete contention that he was entitled to a new trial pursuant to this Court's holding in *Brooks, i.e.,* that trial counsel is deemed ineffective if he fails to meet with the defendant in person prior to trial.

Because Elliott did not include in his PCRA petition the claim alleging trial counsel's ineffectiveness for failing to meet with him prior to trial, and did not obtain permission to amend his petition to include the same, the issue is waived. *See Commonwealth v. Porter,* 613 Pa. 510, 35 A.3d 4, 14 (2012) (holding that a PCRA petitioner may not raise new claims by merely supplementing a pending PCRA petition without court authorization because to do so would "wrongly subvert the time limitation and serial petition restrictions of the PCRA"); Pa.R.Crim.P. 902(B) (providing that the "[f]ailure to state such a ground [for relief] in the [PCRA] petition shall preclude the defendant from raising that ground in any proceeding for post-conviction collateral relief").

Even if we were to assume, for purposes of argument, that Elliott preserved his *Brooks* claim by referencing trial counsel's failure to meet with him prior to trial in the context of the separate issue challenging counsel's failure to investigate evidence of Elliot's prior bad acts, he would not be entitled to relief on the merits of the claim. It is clear that a majority of this Court in *Brooks* expressly required that counsel representing a defendant in a capital murder trial conduct a substantive, face-to-face consultation with the defendant prior to trial, and held that a failure to do so amounted to ineffectiveness of counsel warranting the grant of a new trial. A review of our case law prior to the *Brooks* decision, however, indicates that this Court had declined to evaluate ineffec-

tiveness claims alleging the failure to prepare based solely on the existence or duration of counsel's pretrial face-to-face consultation with the defendant. *See Harvey*, 812 A.2d at 1196–97 (rejecting a claim that trial counsel was ineffective for consulting with defendant for only one hour prior to trial where defendant failed to allege any issues that counsel should have raised or any beneficial information that his counsel would have discovered had further pretrial consultations been held); *Commonwealth v. Mason*, 559 Pa. 500, 741 A.2d 708, 715–16 (1999) (holding that counsel's limited pre-trial consultation with defendant did not render him ineffective because defendant did not identify issues that should have been raised, and the defendant's ability to convey pertinent information to counsel was impaired due to his severe intoxication at the time of the offense); *Commonwealth v. Porter*, 556 Pa. 301, 728 A.2d 890, 896 (1999) (holding that to establish ineffectiveness on the basis of alleged inadequate pretrial consultation, the defendant must establish that counsel inexcusably failed to raise issues that, had they been proffered, would have entitled him to relief); *Commonwealth v. Bundy*, 421 A.2d at 1051 (rejecting claim that trial counsel was ineffective because he met with the defendant only once before trial because the "time devoted to attorney-client consultations affords no basis for inferring the total extent of trial preparation"); *Commonwealth v. Owens*, 454 Pa. 268, 312 A.2d 378, 381 (1973) (holding that "the time actually spent by counsel with the accused discussing his case is not necessarily related to, and affords no basis for inferring, the extent of total trial preparation").

Consistent with the Commonwealth's contention, we conclude that our holding in *Brooks* constituted a departure from prior law to the extent it held that the failure to meet personally with a capital defendant prior to trial constituted ineffective assistance of counsel. Thus, the PCRA court erred by granting Elliott relief based exclusively on *Brooks*, when *Brooks* was not available to appellate counsel to enable him to challenge on direct appeal trial counsel's failure to conduct a pretrial in-person consultation with Elliott. *See Commonwealth v. Carson*, 590 Pa. 501, 913 A.2d 220, 260 (2006)

(holding that counsel cannot be deemed ineffective for failing to advance novel and unaccepted theories).[6]

■ Having rejected the PCRA court's conclusion that Elliott was entitled to a new trial exclusively under *Brooks,* we must examine his claim under the proper framework for ineffectiveness claims. To reiterate, the claim is that appellate counsel was ineffective for failing to challenge trial counsel's lack of preparedness for trial, including his failure to meet personally with Elliott. *See* PCRA Court Opinion, Oct. 13, 2010, at 6 (characterizing Elliott's claim as encompassing the "failure to prepare for trial and failure to interview Elliot prior to trial"). As noted, in addition to demonstrating the arguable merit and lack of reasonable basis prongs of the *Pierce* ineffectiveness test, the governing standard requires a defendant to establish that he was prejudiced by trial counsel's failure to meet with him in order to prepare adequately for trial. This can be demonstrated by alleging beneficial information or issues that counsel should have presented had he been prepared adequately, which would have changed the outcome of the trial. *Porter,* 728 A.2d at 896 (citing *Commonwealth v. Travaglia,* 541 Pa. 108, 661 A.2d 352, 357 (1995) (requiring a defendant to demonstrate prejudice in an ineffectiveness claim by demonstrating that "but for the act or omission in question, the outcome of the proceedings would have been different," and noting that a claim of ineffectiveness could be denied if the petitioner fails to satisfy any one of the three *Pierce* prongs)).

**6.** Considering our holding that *Brooks* was unavailable to trial and appellate counsel as it had not yet been decided at the time of Elliott's trial or direct appeal, and, therefore, cannot sustain a claim of appellate counsel ineffectiveness, we need not entertain the Commonwealth's alternative contention that *Brooks* is distinguishable, although we do not dismiss that possibility out of hand. We further note that the Commonwealth does not suggest that we reexamine the wisdom of our decision in *Brooks* or expound upon our holding therein. Thus, we save for another day the issue of whether, in a post-*Brooks* case, a new trial would be warranted where counsel did not meet personally with the capital defendant prior to trial, but, where, as here, he had a working relationship with the defendant due to his prior representation of him in unrelated criminal matters. We note merely that a record would be necessary to address such issue, which we lack in the instant case as no evidentiary hearing was conducted.

As cogently noted by the Commonwealth, neither Elliott nor the PCRA court have identified any beneficial information or issue that trial counsel would have discovered had he engaged in a more thorough pretrial consultation with Elliott, which would have changed the outcome of his trial. As noted, Elliott asserts that further consultation and/or preparation would have enabled counsel to realize the significance of the time of death evidence and interview the medical examiner so that he could challenge her time-of-death calculation with rebuttal testimony. We examine Elliott's challenge to the medical examiner's time-of-death calculation in our discussion of Issue II, *infra*, however, and conclude that there is no merit to the claim.

As further evidence of prejudice arising from counsel's failure to prepare for trial, Elliott contends that counsel would have learned that he left Nardone's apartment while the victim was still alive. This fact, however, was revealed in Elliott's statement to police, which trial counsel had reviewed prior to trial. Finally, Elliott suggests that had trial counsel engaged in a more thorough pretrial preparation, counsel could have investigated the forensic evidence to support his defense theory that he left before the victim was murdered. He fails, however, to identify what forensic evidence existed or explain how such evidence supported his defense.

Accordingly, as a matter of law, assuming the claim was properly preserved, there is no arguable merit to the contention that appellate counsel was ineffective for failing to challenge trial counsel's preparedness for trial. We further note that Elliott has failed to set forth any issue of material fact, warranting an evidentiary hearing on this claim. Therefore, we reverse the PCRA court's grant of relief on this issue as a matter of law.

## Issue II

### Failure to Object to Medical Examiner's Testimony

We next turn to the second issue for which the PCRA court granted a new trial—that trial counsel was ineffective for

failing to object when the medical examiner testified on rebuttal regarding the approximate time of the victim's death. As noted, Elliott testified that he "guessed" that he left Nardone's residence at approximately 10:00 a.m. on the day of the murder, and that the victim was still alive at that time. N.T., Oct. 26, 1994, at 140–41. The Commonwealth thereafter presented the rebuttal testimony of the medical examiner estimating the victim's time of death as occurring between 5 a.m. and 9 a.m. N.T., Oct. 27, 1994, at 128. The medical examiner explained that her estimate of the victim's time of death was based on the investigator's observation of the body's lividity, which she described as the process through which the body's blood supply stops moving after the person dies, causing the blood to settle and create a purplish discoloration on the skin over a certain period of time. *Id.* at 128–129. Trial counsel unsuccessfully objected to this testimony on the ground that the medical examiner was relying upon a lividity report prepared by her investigator, which had not been admitted as evidence.[7] On cross-examination, the medical examiner conceded that the time of death could have been as late as 10:00 a.m. *Id.*, at 142–43. After the medical examiner concluded her testimony, Elliott testified on redirect that he was unsure about the time he left Nardone's residence.

The PCRA court granted a new trial, holding that trial counsel was ineffective for failing to object when the medical examiner testified that the victim died between 5:00 a.m. and 9:00 a.m. The court's finding of arguable merit was based on its conclusion that such testimony was inadmissible because it was at odds with the medical examiner's notation on the autopsy form that the time of death was "unknown." Due to this perceived discrepancy, the court found that the defense was never given notice that facts different from those set forth in the autopsy report would be presented at trial, and, thus, was not given an opportunity to present an expert witness to

7. As discussed *infra,* Elliott reiterated that objection on direct appeal, and this Court denied relief, holding that the medical examiner's reliance upon the investigator's report was proper as it was standard procedure for the medical examiner to rely on tests performed by members of her office. *Elliott,* 700 A.2d at 1252.

refute the medical examiner's calculation of time of death. The court further held that the time-of-death testimony was inadmissible because it was speculative and was based on the investigator's notes, which the medical examiner did not possess while testifying, a conclusion this Court rejected expressly on direct appeal. In support of its finding of arguable merit, the PCRA court cited only Pa.R.E. 705, which requires that an "expert must testify as to the facts or data on which [her] opinion . . . is based."

As to the reasonable basis prong of the ineffectiveness test, the PCRA court found it difficult to imagine any reasonable strategy for declining to object to inadmissible evidence placing Elliott at the scene of the crime at the time the murder occurred. The PCRA court additionally held that Elliott was prejudiced by trial counsel's failure to object because the case against him was purely circumstantial. It opined that if the jury believed Elliott's testimony that he left at 10:00 a.m., the medical examiner's testimony that the death occurred between 5:00 a.m. and 9:00 a.m. could have been a "crucial element in the jury's decision-making." PCRA Court Opinion, Oct. 13, 1994, at 11. Accordingly, it held that the claim of trial counsel ineffectiveness was meritorious, and appellate counsel was ineffective for failing to raise the issue on direct appeal.

The Commonwealth argues that the PCRA court erred in granting relief because Elliott did not preserve this claim in his PCRA petition, and because the claim is unsupported both factually and legally. It admits that Elliott challenged the medical examiner's rebuttal testimony in his 2009 Amended PCRA Petition, but contends that Elliott's particular objection was that the medical examiner's testimony constituted a "false" opinion, which should have been rebutted, and not that the medical examiner's testimony was inadmissible. Thus, the Commonwealth suggests that we should find the issue waived, and reverse the grant of a new trial.

Regarding the merits of the claim, the Commonwealth submits there is no factual or legal basis for the PCRA court's decision. First, it contends the record does not support the PCRA court's conclusion that the medical examiner's trial

testimony regarding the victim's time of death conflicted with her opinion expressed in the autopsy report. The Commonwealth contends that, contrary to the PCRA court's finding, the autopsy report did not designate the time of death as unknown. Rather, it asserts, the autopsy report noted "5/7/92 UNKNOWN" where the form inquired as to the "date of death" and "time of injury." The report, in fact, made no reference to the victim's time of death. It further submits that the section of the report in which the "unknown" notation was written described factual information of the victim, including name, address, age, and marital status, and did not set forth the examining doctor's professional opinions. There is no inconsistency, the Commonwealth submits, between the medical examiner's lack of factual knowledge of the specific hour the victim was injured, and the medical examiner's ability, based on lividity of the victim's body, to estimate a five-hour period during which the victim died. Having no factual basis for the claim, the Commonwealth concludes that no evidentiary hearing is required for us to conclude that the claim lacks arguable merit.

Second, the Commonwealth argues there is no legal authority supporting the conclusion that the medical examiner's time-of-death rebuttal testimony was inadmissible merely because it was not mentioned in the autopsy report. It contends that the PCRA court's reference to Pa.R.E. 705, which requires that "an expert must testify as to the facts or data on which the opinion or inference is based," does not support a finding of counsel ineffectiveness. Not only was Pa.R.E. 705 adopted in 1998, after Elliott's trial and direct appeal, the Commonwealth argues that the rule was clearly satisfied here because the medical examiner testified that the basis for her time-of-death estimation was her investigator's lividity test. Further, the Commonwealth argues, treating the autopsy report as delineating the scope of permissible testimony misconstrues the nature of such report, which is not intended as a disclosure of expert testimony. The Commonwealth discounts any suggestion that the prosecution failed to provide the defense with notice of the medical examiner's time-of-death calculation,

emphasizing that it did not intend to elicit such testimony until after Elliott testified as to the approximate time he left the murder scene.

Finally, the Commonwealth contends that even assuming there was arguable merit to the claim of trial counsel ineffectiveness, the claim fails for lack of prejudice as the evidence of Elliott's guilt was far greater than the PCRA court suggested. As noted, Nardone's testimony established that Elliott was with the victim prior to the murder, Elliott's sperm was found inside the victim after she had been brutally raped and beaten, and, significantly, Elliott had numerous scratches and bruises on his body, particularly a straight-line bruise on the back of his hand, which matched a similar bruise on the victim's throat. According to the Commonwealth, such injury suggests that Elliott wrapped a cord around his hand and used the cord to strangle the victim. Moreover, considering Elliott's recent history of violent sexual attacks on Lynn Cardinal, Barbara Gogos, and Iris Berson, the Commonwealth concludes there was overwhelming evidence that he committed the instant murder. Concluding that the claim of trial counsel ineffectiveness lacks merit, the Commonwealth contends that the PCRA court's grant of a new trial based on the derivative claim of appellate counsel ineffectiveness was clearly erroneous.

In response, Elliott refutes the Commonwealth's argument that the instant claim is waived. He asserts that the record supports the PCRA court's conclusion that the claim was generally preserved in his 2009 Amended Petition, *see id.,* at 66 (alleging trial counsel ineffectiveness for failing to object to improper and "false" testimony of the medical examiner relating to the victim's time of death); *id.* at 68 (alleging that trial counsel failed to consult his own medical expert to opine as to the victim's time of death and conducted a completely disorganized cross-examination of the medical examiner's testimony). Elliott submits that these claims were further developed in his 2010 Supplemental Brief. *Id.* at 14–16.

Elliott maintains that the ineffectiveness claim has arguable merit because the testimony at issue is speculative and with-

out an adequate scientific basis. He relies on a report of forensic expert Dr. Jonathon Arden, presented to the PCRA court nearly 11 years after Elliott filed his first amended petition, which opined that the medical examiner's opinion was unreliable, and that the victim's death could have occurred as late as 12:00 noon. Arden Report at 2–3.[8] Elliott further mirrors the PCRA court's finding that the time-of-death estimation lacked the reliability necessary for admission because it was inconsistent with the findings contained in the autopsy report. Elliott posits that trial counsel failed to recognize the importance of the time-of-death issue, and failed to cross-examine the medical examiner effectively by presenting contrary forensic evidence to refute it. Overlooking that the evidence was presented in rebuttal and not in the Commonwealth's case-in-chief, Elliott also argues that the medical examiner's time-of-death calculation was inadmissible because trial counsel had no notice that such opinion would be proffered.

Relating to the reasonable basis prong, Elliott argues that the PCRA court correctly held that trial counsel could have had no reasonable strategy for failing to adequately challenge improper expert testimony that placed him at the scene of the crime at the time of the victim's death. Finally, Elliott maintains the PCRA court did not err in concluding that he was prejudiced by counsel's omission. He relies on the lower court's finding that "[t]his was a case of purely circumstantial evidence" and "[t]here were no eye-witnesses to the actual crime." PCRA Court Opinion, Oct. 13, 2010, at 10. Moreover, Elliott points out that the prosecutor emphasized the significance of the medical examiner's time-of-death estimation in its closing argument to the jury. N.T., Oct. 28, 1994 at 7. Finding the three prongs of trial counsel ineffectiveness to be satisfied, Elliott concludes that the PCRA court was correct in holding that appellate counsel was ineffective for failing to raise this meritorious issue on appeal. Alternatively, Elliott maintains that if this Court disagrees with the PCRA court's

8. The PCRA court did not expressly credit or mention Dr. Arden's report in its opinion.

conclusion on this issue, we should remand this matter to the PCRA court for a full hearing on the merits of the claim.

We decline to find this issue waived as the record supports the PCRA court's conclusion that the claim was "raised generally," in Elliott's prior pleadings. *See* PCRA Court Opinion, Oct. 13, 2010, at 8 n.4; Elliott's 2009 Amended Petition at 66, 68; Elliott's 2010 Supplemental Brief at 14–16. We agree, however, with the Commonwealth that the PCRA court's ruling on the merits lacks both a factual and legal basis, and, thus, the PCRA court's grant of a new trial cannot be sustained.

We agree with the Commonwealth that there is no support for the PCRA court's conclusion that an inconsistency exists between the autopsy report and the medical examiner's trial testimony, which would have rendered the time-of-death testimony inadmissible at trial and subject to a successful objection by trial counsel. Contrary to the PCRA court's finding, the autopsy report did not include a professional opinion as to the victim's approximate time of death. Rather, in the portion of the report listing factual information concerning the victim, the report included a summary notation of "unknown" in response to a question as to the time of the victim's injury. Thus, it appears that the PCRA court conflated the time of the victim's injury and the time of the victim's death. As the Commonwealth recognized, there is no disparity between the medical examiner's lack of factual knowledge of the specific hour the victim was injured, *i.e.*, severely beaten, raped, and ultimately strangled, and the medical examiner's ability, based on lividity of the victim's body, to estimate a five-hour period during which the victim died. Thus, the PCRA court erred by finding arguable merit to the ineffectiveness claim based on a purported inconsistency between the medical examiner's report and trial testimony.

We likewise agree with the Commonwealth that the PCRA court's reference to Pa.R.E. 705, which requires that "an expert must testify as to the facts or data on which the opinion or inference is based," does not support a finding

of counsel ineffectiveness. As the medical examiner testified that the basis for her time-of-death estimation was her investigator's lividity test, she clearly set forth the facts or data on which her opinion was based, and an objection grounded on Pa.R.E. 705 would have been futile. Further, to the extent the PCRA court found counsel ineffective for failing to challenge the time-of-death testimony as speculative because it was based on the investigator's notes, we find such legal conclusion to be in conflict with our ruling on direct appeal. *See Elliott*, 700 A.2d at 1252 (holding that it was proper for the medical examiner to estimate the victim's time of death based on the results of her investigator's lividity test, as it was standard procedure for her to rely on tests performed by members of her office). Thus, there is no arguable merit to a claim of trial counsel ineffectiveness based on counsel's failure to object on such grounds, and appellate counsel cannot be deemed ineffective for failing to raise this claim on appeal.

Moreover, to the extent this claim is properly preserved, Elliott has failed to demonstrate that trial counsel was ineffective for failing to engage his own forensic pathologist at the time of trial to refute the medical examiner's calculation of the time of death, as he did in the PCRA proceeding by presenting the report of Dr. Arden. We emphasize that the PCRA court did not base its grant of a new trial on the opinion of Dr. Arden or even reference his report, but rather grounded its grant of a new trial on the non-existent inconsistency between the medical examiner's autopsy report and trial testimony.

Further, Elliott has not demonstrated that Dr. Arden or any similar expert was available at the time of trial. *See Commonwealth v. Chmiel*, 612 Pa. 333, 30 A.3d 1111, 1143 (2011) (holding that counsel's failure to call an expert rebuttal witness does not constitute ineffectiveness; the PCRA petitioner must demonstrate that an expert witness was available who would have offered testimony designed to advance his cause). Counsel is not obligated to call a forensic expert to evaluate critically every expert presented by the prosecution;

the question becomes whether counsel effectively cross-examined the Commonwealth's expert witness. *Id.; Commonwealth v. Marinelli*, 570 Pa. 622, 810 A.2d 1257, 1269 (2002). Here, while the record demonstrates that trial counsel harbored some confusion over the medical examiner's opinion, he succeeded in having the medical examiner acknowledge that the time of death could have been as late as 10:00 a.m., the approximate time Elliott "guessed" he left the residence, thus suggesting the possibility that the victim was alive when Elliott left Nardone's home. N.T., Oct. 27, 1994, at 142–43. Finally, considering that Elliott was unsure as to the time he left that residence, the time of the victim's death was not so obvious an issue that trial counsel should be deemed incompetent for failing to have foreseen it before the issue arose at trial. As the PCRA court erred by finding merit to this claim of trial counsel ineffectiveness, its conclusion that appellate counsel was ineffective for failing to purse the issue on appeal is likewise erroneous.

Having concluded that the Commonwealth prevails on the two issues presented in its appeal, and that the PCRA court erred by granting relief on those claims, we proceed to examine the several issues raised by Elliott in his cross-appeal.

## Issue III

## Elliott's Appeal

### Failure to Investigate Prior Bad Acts

Elliott argues that trial counsel was ineffective for failing to investigate the prior bad acts evidence presented by the Commonwealth at trial, and, thus, was unable to respond effectively through cross-examination or the presentation of impeachment evidence. *See* Revised Brief of Appellee/Cross–Appellant at 39 (asserting that "[d]efense counsel had no opportunity to adjust his trial strategy in light of the new evidence and was completely unprepared to deal with any of these three witnesses at [Elliott's] capital trial, despite the fact

that he represented [Elliott] on charges arising from the incidents with two of the witnesses (Berson and Cardinal)").[9]

As discussed *supra,* to demonstrate a common scheme, plan, or design, the Commonwealth presented the testimony of Lynn Cardinal, Barbara Gogos, and Iris Berson, all of whom were Caucasian women in their twenties, who testified that they had been physically and sexually assaulted by Elliott in separate, unrelated incidents occurring within six months of the instant murder.[10] Trial counsel had knowledge of these prior acts because he had represented Elliott in his criminal trial relating to the allegations of Lynn Cardinal, which resulted in a conviction of indecent assault one month before the instant murder trial commenced.[11] During the Cardinal assault trial, evidence of Elliott's assault on Gogos and Berson had been admitted over trial counsel's objection. *Elliott,* 700 A.2d at 1249 (citing N.T., Oct. 24, 1994, at 20–22).

To demonstrate the arguable merit of his claim, Elliott emphasizes that the record is replete with protestations from trial counsel acknowledging his own lack of preparation to respond to the Commonwealth's prior bad act evidence. *See*

9. It is significant to note that on direct appeal, this Court rejected claims that the Commonwealth violated discovery rules by failing to disclose its intention to use prior bad act evidence. *Elliott,* 700 A.2d at 1248–49. We held that defense counsel learned of the Commonwealth's planned use of the bad acts evidence approximately one week before Cardinal, Gogos, and Berson testified, and that counsel had represented Elliott in the Cardinal trial one month before Elliott's murder trial. This Court further held on direct appeal that the trial court did not abuse its discretion by admitting the prior bad acts evidence, finding that the bad acts were sufficiently similar to the instant case to justify admission of the prior bad acts evidence to show a common scheme, plan, or design. *Id.* at 1249–50. Finally, we opined that the trial court did not abuse its discretion by concluding that the probative value of the prior bad acts evidence outweighed its prejudicial effect because such testimony was also relevant to rebut Elliott's suggestion that the victim's injuries were the result of "rough sex." *Id.* at 1250.

10. The Commonwealth initially intended to present five women to testify as to Elliott's prior bad acts. After trial counsel's protestations, however, it presented only the three witnesses discussed herein.

11. The trial relating to the assault of Berson had not yet occurred at the time of the instant trial, and there was no pending criminal prosecution relating to the assault of Gogos. N.T., Oct. 25, 1994, at 43–44.

*e.g.* N.T., Oct. 18, 1994, at 8 (where trial counsel stated that if prior incidents of Elliott's conduct comes into evidence to demonstrate scheme, plan, and design, "I am not prepared to proceed with this trial, since there is new information in there which I would have to investigate"); N.T., Oct. 19, 1994, at 34 (where trial counsel stated that "should you admit these five incidents [of prior bad acts], I have a big problem with that because I would need to do more investigation that [sic] I am prepared to do right now, and it would take me about 30 to 60 days to do the investigation"); N.T. Oct. 25, 1994, at 5 ("I am not prepared to meet [the Commonwealth's presentation of bad acts evidence] on behalf of the defendant. I have no investigation"); *see also id.* at 40 (where trial counsel informs court that he did not have time to review the statement of prior bad act witness Gogos). Elliott argues that trial counsel had no reasonable basis for failing to investigate the prior bad acts or review the discovery turned over to him regarding the same.

Further, he argues that he was prejudiced by trial counsel's failure to investigate the three bad act witnesses because the prosecution's case against him was based entirely on circumstantial evidence, and each bad act witness had significant weaknesses in their testimony, which competent counsel would have been able to effectively expose. Specifically, relating to Berson's testimony,[12] Elliott highlights that he was never convicted of a crime with respect to Berson, that two other individuals were also arrested for Berson's assault, and that Berson suffered from a psychological condition that caused her to lie. Regarding Gogo's testimony,[13] Elliott emphasizes

12. Berson testified that in the early morning of March 31, 1992, after leaving the nightclub Purgatory, she was attempting to get into her car when Elliott called her a white bitch, and punched her in the face and groin, knocking her out. N.T., Oct. 25, 1994, at 121–125. Berson testified that when she awoke, her skirt and panty hose had been ripped. *Id.*

13. Gogos testified that in December of 1991, she left the nightclub Purgatory with Elliott to take drugs and he assaulted her, put a knife to her throat, and threatened to strangle her and throw her out of a third story window if she did not perform certain sexual acts. N.T., Oct. 26, 1994, at 4–22.

that he was never arrested for the assault, that there were questions as to whether Gogos reported her claims to police, and that trial counsel's cross-examination failed to adequately elicit the questionable veracity of her claims. Finally, concerning Cardinal's testimony, Elliott cites only the fact that trial counsel did not obtain the notes of testimony of the Cardinal assault trial until the day on which she testified in the instant murder case, albeit conceding that trial counsel was familiar with such testimony because he represented Elliott at the Cardinal assault trial.[14] Elliott makes the generalized argument that trial counsel's cross-examination of Cardinal was disorganized, but suggests no specific evidence that counsel could have used to impeach Cardinal had he investigated her allegations more thoroughly.

Elliott concludes that had trial counsel effectively prepared for cross-examination of the prior bad act witnesses, there is a reasonable probability that their testimony would have be disbelieved and the jury would not have reached a guilty verdict on the charge of first degree murder. Finding merit to the underlying claim of trial counsel ineffectiveness, Elliott presumes that appellate counsel was ineffective for failing to raise this claim on direct appeal.

The PCRA court rejected the ineffectiveness claim, holding that, notwithstanding trial counsel's assertions to the contrary, counsel thoroughly investigated Elliott's prior bad acts. It relied on the fact that trial counsel represented Elliott in two of the prior bad act witnesses' trials, reviewed all three statements of the prior bad act witnesses, and thoroughly cross-examined each woman using their statements, hospital records, and notes of testimony from prior trials. It further noted that trial counsel called a defense expert, Dr. Berman, to impeach Berson's testimony with her medical records, which established that she had ingested cocaine on the night

14. Cardinal testified that on November 1, 1992, she encountered Elliott while she was waiting for a bus, and that he later put a knife to her throat, tried to choke her, struck her head against the floor, and sexually assaulted her. N.T., Oct. 26, 1994, at 69–82.

of the alleged assault, and that she suffers from a factitious disorder where she lies for no reason.[15]

The Commonwealth maintains that the PCRA court's findings are supported by the record and free from legal error. It argues that Elliott has failed to identify any new evidence trial counsel could have discovered upon further investigation that would have likely resulted in a different verdict at trial. Thus, it maintains, direct appeal counsel acted reasonably in pursuing a challenge to the admissibility of the bad acts evidence, rather than a claim based on trial counsel's failure to investigate the prior bad act witnesses.

We agree. Even assuming that trial counsel failed to adequately investigate the prior bad act witnesses and had no reasonable strategy for such omission, Elliott has failed to demonstrate the requisite prejudice by establishing what evidence a further investigation would have revealed that would have changed the outcome of the trial. Similar to our holding in Issue I, absent a proffer of information that trial counsel could have uncovered and used to impeach the bad act witnesses' testimony, Elliott's claim that he was prejudiced by a deficiency in his investigation or preparation fails. *See Harvey*, 812 A.2d at 1197 (rejecting claim that counsel was ineffective for not undertaking further investigation where appellant failed to show that doing so would have provided material evidence or would have been helpful to his defense); *Commonwealth v. Hawkins*, 567 Pa. 310, 787 A.2d 292, 304 (2001) (holding conjecture that additional investigation might have yielded "valuable information" is insufficient to establish prejudice for ineffective assistance claim).

Contrary to Elliott's contentions, the alleged deficiencies in trial counsel's cross-examination of the bad act witness are belied by the record, which supports fully the PCRA court's finding that trial counsel thoroughly cross-examined each prior bad act witness using her prior statements, hospital records, and notes of testimony from previous proceedings. Spe-

15. Generally, factitious disorder is a psychological condition where a person falsely produces or exaggerates medical symptoms of another in their care.

cifically, in regard to Berson's testimony, trial counsel's cross-examination utilized her prior preliminary hearing testimony and police statements to reveal to the jury that Elliott had not been convicted of Berson's assault as the trial had not yet occurred; N.T., Oct. 25, 1994, at 132, that the case against Elliott was discharged once because Berson did not appear, *id.* at 133; and that two other individuals had also been arrested for Berson's assault. *Id.* at 136. Further, trial counsel presented his own medical expert who testified that Berson's hospital records reflected that she had ingested cocaine and alcohol on the night of the purported assault and may suffer from a psychological condition that would cause her to fabricate her claim. N.T., Oct. 27, 1994, at 12–13.[16]

Similarly, Elliott's claims of prejudice relating to Gogos' testimony are unsupported by the record as trial counsel's cross-examination cogently revealed that Elliott was never arrested for the purported assault of Gogos, N.T., Oct. 26, 1994, at 31, that Gogos was unsure of what occurred on the night of the purported assault, and that Gogos did not promptly report the assault to the police. *Id.* at 25. Finally, the PCRA court's finding that trial counsel thoroughly cross-examined Cardinal is supported by the record, refuting Elliott's claims to the contrary. Using her prior statements and testimony, trial counsel attacked Cardinal's identification of Elliott as the perpetrator by having her concede that she told police that she could not give a positive identification of Elliott for various reasons including that she was unsure, had a bad memory, and did not look at Elliott's face. N.T., Oct. 26, 1994, at 90–99. Thus, Elliott brings to light no evidence that trial counsel would have been able to offer had he further investigated the prior bad acts relating to Berson, Gogos, or Cardinal, which would have altered the outcome of his trial.

Finding no prejudice arising from trial counsel's alleged failure to investigate the prior bad act witnesses, we conclude

16. Elliott further maintains that trial counsel's further investigation of Berson would have disclosed that her hospital records reflected her parents' disbelief of her claim. Again, contrary to Elliott's contention, trial counsel was already aware of such fact, and unsuccessfully sought to introduce it. *Id.* at 66.

that appellate counsel cannot be deemed ineffective for failing to pursue such issue. *See Commonwealth v. Jones,* 590 Pa. 202, 912 A.2d 268, 278 (2006) (holding that counsel cannot be deemed ineffective for failing to raise a meritless claim). Accordingly, Elliott was properly denied relief on this claim.

## Issue IV

## Denial of Continuance

■ Elliott next contends that the trial court violated his "constitutional rights to due process, a fair trial, and effective counsel" by declining his request for a continuance so that counsel could further investigate evidence to impeach the prior bad act witnesses. Revised Brief of Appellee/Cross–Appellant at 47. Recognizing that this claim of trial court error was waived on direct appeal, Elliott argues that appellate counsel was ineffective for failing to preserve this meritorious issue. He argues that appellate counsel had no reasonable strategy for failing to pursue the issue on direct appeal, and that, had counsel done so, there is a reasonable probability that this Court would have granted him a new trial.

The PCRA court rejected this claim, finding that because trial counsel thoroughly investigated Elliott's prior bad acts, a continuance was not necessary. The Commonwealth contends that the PCRA court's ruling was correct. It submits that Elliott's underlying claim of trial court error lacks arguable merit because he has failed to address how the trial court's denial of a continuance constituted an abuse of discretion. Relying on its argument in the previous issue, the Commonwealth further emphasizes that Elliott has failed to identify any evidence that counsel could have discovered had the case been continued; thus, he cannot demonstrate that the grant of a continuance would have changed the outcome of his trial.

We agree. To prevail on the underlying claim of trial court error, Elliott must establish that the trial court's denial of a continuance amounted to an abuse of discretion. *See Commonwealth v. Boxley,* 596 Pa. 620, 948 A.2d 742, 746 (2008) (holding that the decision whether to grant a continuance lies in the sound discretion of the trial court and will not be

disturbed absent an abuse of discretion). As noted in the discussion of Issue III, Elliott fails to suggest what purported impeachment evidence trial counsel would have discovered had he been afforded additional time to investigate the prior bad act witnesses. Thus, he has failed to demonstrate any abuse of discretion on the part of the trial court in denying the continuance. *See Commonwealth v. Auker*, 545 Pa. 521, 681 A.2d 1305, 1316–17 (1996) (holding that trial counsel did not abuse its discretion by denying a continuance where appellant failed to specify the evidence which might have been revealed if the continuance had been granted and counsel had been afforded the opportunity to investigate further). Accordingly, appellate counsel cannot be deemed ineffective for failing to challenge the trial court's denial of a continuance on direct appeal. *See Commonwealth v. Carson*, 559 Pa. 460, 741 A.2d 686, 697 (1999) (counsel cannot be deemed ineffective for failing to raise meritless claim).

## Issue V

## Challenge to Admission of Prior Bad Acts

▉▉▉▉▉ Acknowledging that appellate counsel unsuccessfully challenged the admissibility of the bad acts evidence on direct appeal, Elliott argues that appellate counsel was ineffective for failing to raise the distinct contention that the admission of bad acts evidence violated his federal constitutional right to due process. *See* Revised Brief of Appellee/Cross–Appellant at 51 (citing *McKinney v. Rees*, 993 F.2d 1378 (9th Cir.1993) for the proposition that federal due process is violated by the introduction of "other crimes" evidence unless the details of the other incident were relevant to an essential element in the instant homicide prosecution, and the admission of those details did not render the trial fundamentally unfair). Without addressing any federal due process component of the ineffectiveness claim, the PCRA court concluded summarily that the instant issue was previously litigated on direct appeal, and, thus, not cognizable under the PCRA. PCRA Court Opinion, Oct. 13, 2010, at 12–13 (citing 42 Pa.C.S. § 9543(a)(3)).

The Commonwealth argues that the PCRA court properly denied relief, although it appears to concede that the claim has not been previously litigated on direct appeal. Instead, the Commonwealth advocates that we deny relief on the basis that the claim of appellate counsel ineffectiveness lacks arguable merit. The Commonwealth emphasizes that on direct appeal this Court held that: (1) the bad acts evidence was admitted properly to show a common scheme, plan or design, and to rebut Elliott's suggestion that the victim's injuries arose from "rough sex;" (2) the bad acts evidence was not unduly prejudicial; and, (3) the trial court had issued appropriate instructions explaining the limited use of the prior bad acts evidence. Considering these findings, the Commonwealth maintains, Elliott cannot now contend credibly that the admission of relevant evidence, which was more probative than prejudicial, was unfair, let alone so fundamentally unfair as to violate Elliott's federal constitutional right to due process.

The Commonwealth's argument is sound. The PCRA court properly determined that Elliott is not entitled to relief, notwithstanding that it erroneously characterized the issue as previously litigated, and, thus, not cognizable under the PCRA. *See Commonwealth v. Collins*, 585 Pa. 45, 888 A.2d 564, 573 (2005) (holding that a Sixth Amendment claim of ineffectiveness raises a distinct legal ground for purposes of state PCRA review under 42 Pa.C.S. § 9544(a)(2) than the underlying claim of trial court error). Unlike the instant claim, Elliott's challenges to the admission of prior bad acts evidence on direct appeal did not encompass a claim of counsel ineffectiveness for failing to challenge the evidence on federal due process grounds. Accordingly, this Court did not rule on the merits of this issue on direct appeal.

Nevertheless, Elliott's ineffectiveness claim fails for lack of merit as the foundation of the underlying federal due process claim is that the prior bad acts evidence was irrelevant and unduly prejudicial, and that the trial court provided erroneous instructions. Because this Court rejected these identical arguments on direct appeal, *Elliott*, 700 A.2d at 1248–50, Elliott has failed to demonstrate arguable merit to the claim that

appellate counsel was ineffective for failing to pursue a federal due process claim based on these same principles. *See Commonwealth v. Williams*, 597 Pa. 109, 950 A.2d 294, 320 (2008) (rejecting claim that prior counsel were ineffective for not challenging introduction of other crime evidence as violating due process or seeking limiting instruction in light of holding on direct appeal that any error in admitting evidence was harmless). Accordingly, Elliott is not entitled to relief on this claim.

## Issue VI

## Prosecutorial Misconduct

Elliott next argues that the prosecutor committed numerous acts of misconduct and that trial and appellate counsel were ineffective to the extent that they did not object or pursue the issue on appeal. Hampering review of this claim is Elliott's failure to distinguish between those assertions of prosecutorial misconduct to which trial counsel objected and/or appellate counsel pursued on direct appeal, and those assertions of prosecutorial misconduct to which no objection was lodged. Related thereto, Elliott fails to analyze independently the reasonable basis and prejudice prongs of the ineffective assistance of counsel standard as it relates to each alleged deficiency in trial or appellate counsel's performance. Such lack of development, in and of itself, could lead to rejection of the claim. *See Commonwealth v. Tedford*, 598 Pa. 639, 960 A.2d 1, 28 (2008) (holding that the failure to identify and distinguish which claims of prosecutorial misconduct have been previously litigated and which were waived permits rejection of the underlying claims of prosecutorial misconduct, which in turn, eviscerates the cognizable layered claims). Nevertheless, as discussed *infra*, we have examined all of Elliott's underlying claims of prosecutorial misconduct and find that they lack merit. Accordingly, we conclude that the derivative claims of counsel ineffectiveness do not entitle Elliott to relief.

We begin by reviewing the relevant law.

[A] claim of ineffective assistance grounded in counsel's failure to object to a prosecutor's comments may succeed when the petitioner demonstrates that the prosecutor's comments violated a constitutionally or statutorily protected right, such as the Fifth Amendment privilege against compulsory self-incrimination or the Sixth Amendment right to a fair trial, or a constitutional interest such as due process. To constitute a due process violation, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial. The touchstone is the fairness of the trial, not the culpability of the prosecutor.

A prosecutor may make fair comment on the admitted evidence and may provide fair rebuttal to defense arguments. Even an otherwise improper comment may be appropriate if it is in fair response to defense counsel's remarks. Any challenge to a prosecutor's comment must be evaluated in the context in which the comment was made. During closing argument in the penalty phase, a prosecutor must be afforded reasonable latitude, and permitted to employ oratorical flair when arguing in favor of the death penalty. It is not improper for the prosecutor to urge the jury to view the defense's mitigation evidence with disfavor and thus to impose the death penalty.

Not every unwise, intemperate, or improper remark made by a prosecutor mandates the grant of a new trial[.] Reversible error occurs only when the unavoidable effect of the challenged comments would prejudice the jurors and form in their minds a fixed bias and hostility toward the defendant such that the jurors could not weigh the evidence and render a true verdict.

*Commonwealth v. Spotz*, 616 Pa. 164, 47 A.3d 63, 97–98 (2012) (internal citations and quotation marks omitted).

Specifically, Elliott argues that the prosecutor committed misconduct at trial by: welcoming the victim's family in the opening statements to the jury; questioning Elliott's belief in the credibility of the Commonwealth's witnesses; and conveying a general lack of respect towards him. *See* N.T., Oct. 27,

1994, at 94 ("Among those people that you listed as being truthful in their testimony, you did not include yourself ... Does that mean you are now saying that your testimony is false also?"); *id.* at 145 ("What form of transportation did you take to get home after eleven o'clock? Take a pogo stick?"). He also contends that the prosecutor conveyed his personal disbelief of Elliott's testimony; essentially "testified" that Frank Nardone has a handicapped daughter by posing a question wherein that fact was asserted; and asked highly improper and argumentative questions about Elliott's supposed racial animus. *See* N.T., Oct. 17, 1994, at 104–105 (where the prosecutor asked Elliott whether he assaulted the victim because he hated white women). Elliott further submits that the prosecutor committed misconduct by asking him about the victim's dying words and the details of the murder. *See* N.T., Oct. 27, 1994 at 112–113 ("When [the victim] was dying, did she call out to her mother? ... Which assault came first, Mr. Elliott, the one frontally or the one from behind while holding her neck with an electric cord, as you strangled her to death?").

Finally, Elliott challenges the prosecutor's comments during closing argument that purportedly invoked the victim's memory and referenced spiritual authority. N.T., Oct. 28, 1994 at 3 ("It is fitting and proper that I do this for her memory and also on behalf of the people that I have been so privileged to represent. In a sense, this closing speech [has] become, for me, sort of a benediction for all the evil that we have been confronted with in this case."); *see also* N.T., Oct. 28, 1994 at 18 (wherein the prosecutor concluded his remarks by saying, "God bless you.").[17]

17. In addition to challenging the statements made by the prosecutor at trial, Elliott also argues that the prosecutor committed misconduct prior to trial by failing to disclose timely the statements of prior bad act witnesses, and that prior counsel were ineffective for failing to pursue the issue. This claim fails as both trial and appellate counsel challenged the timing of the Commonwealth's disclosure of prior bad act evidence, and this Court held on direct appeal that the prosecutor did not violate his discovery obligations in this regard. *Elliott,* 700 A.2d at 1248–49.

Elliott concludes that the aforementioned comments constitute prosecutorial misconduct, which, both individually and cumulatively, deprived him of his Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the Pennsylvania Constitution. As noted, Elliott makes the general assertion that neither trial nor appellate counsel acted pursuant to a reasonable strategy when they failed to challenge the prosecutor's statements, and that he was prejudiced by counsel's failure to do so.

The PCRA court held that because none of the comments at issue rose to the level of prosecutorial misconduct that would warrant the grant of a new trial, counsel cannot be deemed ineffective for failing to challenge them. It explained that when the prosecutor said "good afternoon" to the victim's family, along with the jury, judge, and defense counsel, such comment constituted a common courtesy and was not prejudicial to Elliott. The court also held that at no time did the prosecutor question Elliott's belief regarding the credibility of Commonwealth witnesses or give the prosecutor's personal opinion as to Elliott's guilt or the credibility of his testimony. Regarding the particular comments that Elliott contended conveyed a lack of respect, the court ruled that such statements were "snarky" and "sarcastic," *see* N.T., Oct. 27, 1994, at 94, 145, but did not rise to the level of prosecutorial misconduct that is so prejudicial that the jury could not weigh the evidence objectively. As to Elliott's contention that the prosecutor "testified" that Frank Nardone's daughter was handicapped when he asserted such fact in a question posed to Elliott, the PCRA court found such comment to be irrelevant and not prejudicial. It further held that the questioning as to Elliott's racial animus was not improper given the evidence that his prior attacks on the three prior bad act witnesses were racially motivated. *See* PCRA Opinion, Oct. 13, 2010, at 22 ("Elliott's racial animus towards white women became part of the fabric of the case and the prosecutor's questions regarding this prejudice were proper.").

The PCRA court examined closely Elliott's contention that the prosecutor committed misconduct when he asked Elliott about the victim's dying words and the details of the murder. N.T., Oct. 27, 1994, at 112–113 ("When [the victim] was dying, did she call out to her mother? ... Which assault came first, Mr. Elliott, the one frontally or the one from behind while holding her neck with an electric cord, as you strangled her to death?"). The court pointed out that trial counsel objected and unsuccessfully sought a mistrial, and that the trial court sustained the objection as to the victim's dying words. The PCRA court also emphasized that the trial court cautioned the jurors that that they should only consider the evidence proven at trial and that questions and statements of counsel are not evidence. Recognizing that jurors are presumed to have followed the trial court's instructions, the PCRA court denied relief on this claim. PCRA Court Opinion, Oct. 13, 2010, at 23 (citing *Commonwealth v. DeJesus*, 580 Pa. 303, 860 A.2d 102, 111 (2004) (holding that a jury is presumed to follow the trial court's instructions)).[18]

Finally, the PCRA court rejected Elliott's contention that the prosecutor committed misconduct during closing argument by invoking the victim's memory and referring to spiritual authority. As noted, the prosecutor stated in closing remarks, "[i]t is fitting and proper that I do this for [the victim's] memory," and "this closing speech [has] become, for me, sort of a benediction for all the evil that we have been confronted with in this case." N.T., Oct. 28, 1994 at 3. The prosecutor further concluded his remarks by stating, "God bless you." *Id.* at 18. The trial court held that such references did not amount to the type of religious inferences that warrant the

---

**18.** Moreover, appellate counsel pursued on direct appeal the challenge to the prosecutor's remarks concerning Elliott's use of the cord to strangle the victim. Recognizing the medical examiner's testimony that the strangulation marks on the victim's neck were consistent with the shape of the cord from an electrical heater in Nardone's home, and that Elliott had a straight-line bruise on the back of his hand, this Court concluded that the prosecutor's comment that Elliott used the cord to strangle the victim could be fairly inferred from these facts and was not improper. *Elliott,* 700 A.2d at 1254. Thus, any derivative claim of ineffectiveness based on appellate counsel's failure to pursue this issue lacks a factual basis.

grant of a new trial. PCRA Court Opinion, Oct. 13, 2010, at 24 (citing *Commonwealth v. Chambers*, 528 Pa. 558, 599 A.2d 630, 644 (1991) (holding that a new trial was warranted where the prosecutor stated, "As the Bible says, and the murderer shall be put to death")). The PCRA court reiterated the trial court's instruction to the jury that the words and speeches of the attorneys are not evidence.

In its brief to this Court, the Commonwealth examines each challenged statement by the prosecutor and concludes that every determination of the PCRA court is supported by the record and free of legal error. Upon a close examination of the record in this case, we agree. Considering each challenged statement individually and in the aggregate, we conclude that Elliott has failed to demonstrate that the unavoidable effect of the challenged comments prejudiced the jurors and formed in their minds a fixed bias and hostility toward Elliott that the jurors could not weigh the evidence and render a true verdict. *Spotz*, 47 A.3d at 98. Having properly concluded that no instance of prosecutorial misconduct warranted the grant of a new trial, the PCRA court correctly denied relief on Elliott's derivative claims of counsel ineffectiveness.

## Issue VII

### Refusal to Admit Evidence of Nardone's Death

 Elliott argues that appellate counsel was ineffective for failing to challenge on direct appeal the trial court's refusal to admit evidence regarding the circumstances of Frank Nardone's death. As noted, Nardone was with Elliott and the victim on the night of the murder in 1992, and awoke to find the victim dead in his residence. Nardone testified at Elliott's preliminary hearing, but died in 1994 prior to Elliott's trial. Due to Nardone's unavailability, the Commonwealth presented at trial Nardone's testimony from Elliott's preliminary hearing. To suggest that it may have been Nardone, instead of Elliott, who beat and strangled the victim in the instant murder, trial counsel sought to introduce evidence establishing that Nardone died after having been struck by his girlfriend

whom he had physically assaulted.[19] The trial court refused to admit the evidence surrounding Nardone's death in 1994, finding that it was irrelevant and too remote to the murder of the victim that occurred in 1992. N.T., Oct. 24, 1994, at 168–71.

Elliott maintains that the trial court's refusal to admit such evidence violated his constitutional right to present a defense, and that appellate counsel was ineffective for failing to pursue this issue on appeal. He asserts that appellate counsel had no reasonable basis for failing to raise this meritorious issue on appeal, and that he was prejudiced by counsel's failure to do so. At a minimum, Elliott seeks a remand to the PCRA court so that discovery can be provided and a full record could be made with regard to this claim.

The PCRA court denied relief on this claim, holding that the trial court did not abuse its discretion by declining to admit irrelevant and speculative evidence relating to the circumstances surrounding Nardone's death. Accordingly, it concluded that the derivate claim of appellate counsel ineffectiveness fails.

The Commonwealth contends that the PCRA court did not err in denying relief on this claim. It argues that Elliott has failed to demonstrate that the trial court abused its discretion by refusing to admit irrelevant evidence relating to Nardone's death, which occurred more than two years after the instant murder. Thus, it concludes that appellate counsel cannot be deemed ineffective for failing to raise a meritless claim. Further, the Commonwealth argues that Elliott has failed to demonstrate that the PCRA court abused its discretion by denying his request for discovery. It asserts that Elliott failed to demonstrate good cause for such discovery because the Commonwealth provided him with a copy of a report

19. The PCRA court described the cause of Nardone's death as a heart attack after having been struck several times by his girlfriend. PCRA Court Opinion, Oct. 13, 2010, at 14. This appears to be supported by the record, which establishes that Nardone's death certificate stated the cause of death as "occlusive coronary artery disease with contribution of blunt force injuries, emphysema, and cancer of his kidney." N.T., Oct. 24, 1994, at 165.

concerning Nardone's death, and Elliott fails to indicate what further documents exist to support his claim.

The PCRA court's ruling is supported by the record and is free from legal error. As recognized by the PCRA court, appellate courts review a trial court's ruling on the admissibility of evidence for an abuse of discretion. *Commonwealth v. Dillon*, 592 Pa. 351, 925 A.2d 131, 136 (2007). A trial court may exclude evidence that is irrelevant to the issues presented. Evidence is not relevant "unless the inference sought to be raised by it bears upon a matter in issue and renders the desired inference more probable than it would be without the evidence." *Commonwealth v. Vallejo*, 532 Pa. 558, 616 A.2d 974, 976 (1992). Here, the trial court refused to permit Elliott to introduce evidence that Nardone died in 1994 after assaulting his girlfriend, finding that such evidence had no bearing on whether Elliott committed the victim's murder in 1992. N.T., Oct. 24, 1994, at 168–71. Elliott has failed to demonstrate that the trial court abused its discretion. The fact that Nardone may have physically assaulted a woman in 1994, causing her to inflict injury upon Nardone, does not make it more probable than not that Nardone, and not Elliott, murdered the victim in 1992. Elliott's contrary theory constitutes nothing more than rank speculation. *See Commonwealth v. Williams*, 554 Pa. 1, 720 A.2d 679, 686 (1998) (holding that the trial court properly excluded evidence that other persons had a motive to kill the victims because, *inter alia*, such evidence was speculative); *Commonwealth v. Cook*, 544 Pa. 361, 676 A.2d 639, 647 (1996) (holding that the trial court properly excluded evidence relating to a purported additional suspect where the evidence was speculative and had little or no probative value). Accordingly, appellate counsel cannot be deemed ineffective for failing to raise the issue on appeal.

We further agree with the Commonwealth that Elliott has not demonstrated good cause for further discovery on this issue. *See* Pa.R.Crim.P. 902(E)(2) (providing that discovery in a first counseled petition in a death penalty case is only permitted upon leave of court after a showing of good cause).

Elliott offers no explanation regarding what further evidence or documentation exists to support his request. Thus, the PCRA court did not abuse its discretion by denying Elliott discovery additional to that already provided by the Commonwealth. *Commonwealth v. Hanible*, 612 Pa. 183, 30 A.3d 426, 484 (2011) (holding that speculation that production of requested documents might reveal exculpatory evidence is insufficient to establish good cause for discovery).

## Issue VIII

### Instruction on Lie Detector Test

As background information on this claim, we begin by noting that Elliott gave a statement to police in which he indicated that he would be willing to take a lie detector test. No test, however, was ever administered. At trial, during the cross-examination of the detective who had taken Elliott's statement, counsel revealed to the jury that Elliott agreed to take a lie detector test, which, counsel asserted, demonstrated that Elliott was not afraid of the truth. N.T., Oct. 24, 1994, at 219–225. Thereafter, the trial court instructed the jury that Elliott's offer to take the polygraph test was not relevant at that point in the proceeding because such tests are unreliable and the law prohibits their introduction into evidence. N.T., Oct. 24, 1994, at 224.[20] Trial counsel did not object to this instruction. However, the court later stated that it had allowed the aforementioned questioning of the detective "because the defendant wanted to make an argument that he offered to take the test. That can be argued to the jury." *Id.* at 225. Consequently, in his closing argument, trial counsel

**20.** The trial court stated:
> That's argument. Members of the jury, I do not want to belabor this point too much. We do not admit into evidence polygraph tests. There is no guarantee of their accuracy. They can be wrong just as much as they can be right. The detective may have just asked the question to see what the response was. And he got a response and that is the end of that. The detective is aware of the law regarding polygraph testing and so forth. Whether or not the response to that question indicates anything inside the mind of the defendant is really not relevant at this point.

*Id.* at 224.

urged the jury to consider that Elliott never confessed to the crime and, in fact, agreed to take a lie detector test. N.T., Oct. 27, 1994, at 214–16.[21]

Elliott now asserts that the trial court's instruction to the jury—that his willingness to take a lie detector test was irrelevant—denied his constitutional rights to confrontation, to present a defense, and to due process because the instruction prevented the jury from considering evidence of his lack of consciousness of guilt. Revised Brief of Appellee/Cross Appellant at 64 (citing *Commonwealth v. Wagner*, 383 Pa.Super. 128, 556 A.2d 462, 464–65 (1989) (holding that where the Commonwealth offers evidence of flight to demonstrate a consciousness of guilt, the defendant must be permitted to rebut that inference by introducing evidence that he fled for another reason that was consistent with his innocence)). Regardless of the fact that the Commonwealth did not present evidence of flight or any other evidence to support an inference of his consciousness of guilt, Elliott argues that it was error for the trial court to prevent him from establishing a lack of consciousness of guilt. He concludes that appellate counsel was ineffective for failing to pursue on direct appeal this meritorious and preserved claim, and that, had counsel raised the issue on appeal, there is a reasonable probability that this Court would have granted a new trial.

The PCRA court denied relief on this claim, finding that the trial court's instruction was proper, considering the case law rendering references to lie detector tests inadmissible. PCRA Court Opinion, Oct. 13, 2010, at 15 (citing *Commonwealth v. Camm*, 443 Pa. 253, 277 A.2d 325, 333 (1971) (holding that "[t]he rule in Pennsylvania is that reference to a lie detector test or the result thereof which raises inferences concerning

21. In discussing ways to determine the credibility of witnesses, the prosecutor stated generally in his subsequent closing argument that some witnesses were "slick," which may indicate an effort to conceal guilt. N.T., Oct. 28, 1994, at 6 ("Draw your contrast and decide whether or not slick does not mean to show a conscious and continuing effort to conceal his own guilt."). The prosecutor made no reference to a lie detector test or any specific act committed by Elliott that demonstrated his personal consciousness of guilt.

the guilt or innocence of a defendant is inadmissible")). The PCRA court further emphasized that trial counsel argued in his closing argument the very point which he contends he was denied the opportunity to make—that Elliott's willingness to take a lie detector test demonstrated a lack of consciousness of guilt.

The Commonwealth argues that the PCRA court's denial of relief on this ineffectiveness claim is correct because the underlying claim of trial court error is meritless.[22] First, it argues that this Court has already ruled that testimony regarding a defendant's purported willingness to undergo a polygraph examination is inadmissible for the same reasons that a defendant's refusal to take such test is inadmissible. *Commonwealth v. Saunders,* 386 Pa. 149, 125 A.2d 442, 445–46 (1956) (holding that because a polygraph test is not judicially acceptable, it is obvious that neither a professed willingness nor a refusal to submit to such a test should be admitted because a defendant's willingness is merely a self-serving act or declaration which obviously could be made without any possible risk).

The Commonwealth further submits that Elliott's claim lacks a factual basis because the trial court did not prohibit the jury from considering Elliott's professed willingness to take a polygraph, but rather stated that the implications of the testimony were "really not relevant at this point." N.T., Oct. 24, 1994, at 224. It emphasizes that the trial court stated expressly that Elliott could make the argument to the jury later, *id.* at 225, and trial counsel, in fact, argued to the jury in closing remarks that Elliott's willingness to submit to a polygraph should be considered. N.T., Oct. 27, 1994, at 214–16. Accordingly, the Commonwealth concludes there is no merit to the claim of trial court error, and that neither trial nor

22. The Commonwealth additionally argues that the underlying issue of trial court error is waived because, contrary to Elliott's assertion, trial counsel did not object to the trial court's instruction. It submits that Elliott's current claim, sounding only in appellate counsel ineffectiveness, cannot prevail absent an assertion of a deficiency in trial counsel's performance.

appellate counsel can be deemed ineffective for failing to pursue the claim further.

We agree. The trial court's instruction to the jury was correct as this Court expressly held in *Saunders* that a defendant's willingness to submit to a polygraph is not generally admissible because lie detector tests are judicially unacceptable and a defendant's willingness to take one is merely a self-serving act or declaration which could be made without any possible risk. *Id.* at 445–46. Elliott neither distinguishes *Saunders,* nor suggests that we reexamine its holding. While this Court has refined the law relating to lie detector references by explaining that every reference to a lie detector test may not be prejudicial and warrant the grant of a new trial, *see Commonwealth v. Fortenbaugh,* 620 Pa. 483, 69 A.3d 191, 195 (2013) (holding that not every mention of a polygraph is prejudicial or worthy of a mistrial), the *Saunders* holding regarding the general inadmissibility of a defendant's willingness to take a polygraph test remains undisturbed. Moreover, Elliott's argument conflates his constitutional rights to due process, present a defense, and confront witness, which are in no way implicated by the court's instruction concerning the polygraph test, with a purported, but unfounded right to present evidence of lack of consciousness of guilt absent the Commonwealth's presentation of evidence demonstrating Elliott's consciousness of guilt. *See Commonwealth v. Thomas,* 54 A.3d 332, 341–43 (Pa.2012) (rejecting claim that the trial court erred by refusing to instruct the jury that it could infer a "consciousness of innocence" from the defendant's postarrest cooperation with police, particularly where no consciousness of guilt instruction had been given). Because the claim of trial court error is meritless, the derivative claim of counsel ineffectiveness fails.

## Issue IX

### PCRA Court's Failure to Grant Discovery

Elliott next argues that the PCRA court erred by failing to grant him discovery of "the police paperwork generated during the investigation of this case, including the Phila-

delphia police 'homicide book.' " Revised Brief of Appellee/Cross–Appellant at 66. He asserts that because he gave a statement to police the same day the murder occurred, but was not arrested for the murder until one and a half years later, homicide detectives must have continued to investigate the crime and create a body of work, which he is entitled to review. Elliott further requests discovery with respect to the prior bad act evidence and the particular detectives who investigated such cases. Elliott maintains that the PCRA court denied his discovery requests without explaining its ruling or addressing the issue in its opinion. Finally, he seeks a remand so that he can obtain and review the discovery, and have an opportunity to amend his PCRA petition with any new facts that are revealed.

The Commonwealth responds that the PCRA court did not abuse its discretion by denying Elliott further discovery. It asserts that Elliott has made no meaningful attempt to connect the vague documents he seeks to the specific claims in his PCRA petition, and provides no basis for concluding that any discoverable evidence was, in fact, withheld. Instead, the Commonwealth maintains, Elliott merely speculates that a review of the requested documents might reveal counsel's ineffectiveness. These bald assertions, the Commonwealth maintains, fail to demonstrate an abuse of discretion on the part of the PCRA court.

This Court reviews the denial of discovery for an abuse of discretion. *Commonwealth v. Collins,* 598 Pa. 397, 957 A.2d 237, 272 (2008). As noted, discovery in death penalty collateral proceedings is permissible only upon leave of court, and only for good cause shown. Pa.R.Crim.P. 902(E)(2). " 'A showing of good cause requires more than just a generic demand for potentially exculpatory evidence.' " *Collins,* 957 A.2d at 272 (quoting *Commonwealth v. Bryant,* 579 Pa. 119, 855 A.2d 726, 750 (2004)).

We agree with the Commonwealth that Elliott has failed to demonstrate that the PCRA court abused its discretion by denying Elliott's request for additional discovery. Elliott has

not identified any document that was withheld from him that would have been exculpatory, and his claims to the contrary constitute mere speculation. *See Hanible,* 30 A.3d at 484 (holding that conjecture that opportunity to review "homicide file" might yield exculpatory evidence is inadequate to demonstrate good cause for discovery); *Commonwealth v. Carson,* 913 A.2d at 261 (holding that speculation that review of requested documents will uncover exculpatory evidence does not satisfy good cause requirement). Thus, Elliott is not entitled to relief on this claim.

## Issue X

### Cumulative Error

In his last claim, Elliott argues that he is entitled to relief from his conviction and sentence because of the cumulative prejudicial effect of all of the errors described in his brief. This Court has held that no number of failed ineffectiveness claims may collectively warrant relief if they fail to do so individually. *Commonwealth v. Busanet,* 54 A.3d 35, 75 (Pa.2012). When the failure of individual claims is based upon a lack of prejudice, however, then the cumulative prejudice from those individual claims may properly be assessed. *Id.* In the instant case, we have rejected claims of ineffectiveness based solely on a lack of prejudice in connection with only one issue: whether trial counsel was ineffective for failing to investigate the prior bad act witnesses. Thus, there can be no aggregation of prejudice from multiple ineffectiveness claims, and Elliott's claim of cumulative error fails.

## Conclusion

In summary, we reverse the PCRA court's grant of a new trial on the ground that trial counsel was ineffective for failing to consult personally with Elliott prior to trial or otherwise prepare for trial, and that appellate counsel was ineffective for failing to raise this issue on appeal. Additionally, we reverse the PCRA court's grant of a new trial on the ground that trial counsel was ineffective for failing to challenge the medical examiner's testimony regarding the time of the victim's death,

and that appellate counsel was ineffective for failing to pursue the issue. Finally, we affirm the trial court's denial of relief on the remaining claims in Elliott's PCRA petition.

Justice STEVENS did not participate in the consideration or decision of this case.

Chief Justice CASTILLE, Justices TODD and McCAFFERY join the opinion.

Chief Justice CASTILLE files a concurring opinion.

Justice SAYLOR files a concurring opinion.

Justice EAKIN files a concurring opinion.

Chief Justice CASTILLE, concurring.

I join the Majority Opinion. I write separately only because I continue to believe that the analysis set forth in *Commonwealth v. Brooks*, 576 Pa. 332, 839 A.2d 245 (2003) conflated two distinct lines of Sixth Amendment analysis, and the PCRA court's erroneous ruling in this case (on a waived claim, no less) shows the mischief the lack of clarity in *Brooks* can cause.

In *Brooks*, a majority of the Court concluded that trial counsel's failure to meet with a capital murder defendant prior to trial amounted to ineffectiveness under the three-prong *Strickland/Pierce*[1] test. The majority reached that conclusion without identifying an instance of actually deficient and prejudicial performance at trial, *i.e.*, other claims, additional information, or evidence that counsel could have discovered but for his failure to meet with *Brooks* prior to trial that would have changed the outcome of the proceedings. This fact formed the basis for my concurring opinion in *Brooks*. I noted that the *Brooks* majority had established a bright-line rule that failure to meet with a client face-to-face established ineffectiveness *per se*. I further pointed out that the majority's

1. The three-prong ineffectiveness test set forth in *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973, 974 (1987), implements the performance and prejudice standard of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

reliance upon a *per se* conclusion to find *Strickland/Pierce* prejudice in fact was inconsistent with that standard, which requires an assessment of actual prejudice. I further argued that the majority's analysis of prejudice was more in line with the U.S. Supreme Court's decision in *U.S. v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).[2]

I continue to believe that the actual analysis of the majority in *Brooks* is defensible as a Sixth Amendment matter only as an application of *Cronic* and not under *Strickland;* I continue to believe that the *per se* rule announced there was overbroad because the majority failed to come to terms with *Cronic;* and this case shows why better precision is required. The PCRA court read *Brooks* as entitling appellee to relief based on the sole fact that counsel did not have a face-to-face meeting with him prior to his trial in this case. But, the facts here show why *Brooks* should not be read in such an erroneous fashion. First, although counsel may not have met with appellee in person to discuss his upcoming trial for murder in this matter, counsel was well-acquainted with appellee. Counsel had just finished representing appellee in a rape trial one month prior to the trial here. Thus, he knew appellee, he had an opportunity to build a relationship with appellee, he knew appellee's demeanor, and he was familiar with much of the "prior bad acts" evidence that the Commonwealth would use against appellee in the murder trial. Second, and relatedly, unlike the defendant in *Brooks,* appellee was not forced to represent himself because of a destruction in the attorney-client relationship arising from a failure of a lawyer to meet his client face-to-face prior to representing him. Counsel here had a reason not to meet with appellee, whom he knew from representing him in the very recent past. Notably, as explained by the Majority, appellee has not pointed to any action or inaction of counsel, arising from the failure to meet with him, or anything which would have changed the outcome of the proceedings.

**2.** In *Cronic,* the High Court concluded that there might be "circumstances of" a certain "magnitude" that required a court to forego an individual inquiry into counsel's performance because the defendant had been denied counsel entirely or during a critical stage of the proceedings.

The point is that not all failure to meet cases are alike, and not all have the same effect upon trial. This case presents a routine (albeit waived) ineffectiveness claim, and warrants treatment as any other ineffectiveness claim under *Strickland,* requiring the demonstration of actual prejudice. *Brooks* should be expressly confined to its facts and construed as an application of *U.S. v. Cronic, supra.*

Justice SAYLOR, concurring.

I join the majority opinion, except for its treatment of Issue I. I agree with the majority that this claim (deriving from trial counsel's obviously poor performance in failing to meet with Appellant about his capital prosecution prior to the eve of trial) is waived. Although I believe this type of challenge would have implicated relaxed waiver, recourse to such doctrine is no longer available for the reasons delineated by the Court majority in *Commonwealth v. Freeman,* 573 Pa. 532, 827 A.2d 385 (2003). Thus, in my view, constraints imposed upon our review preclude the award of state post-conviction relief.

As to *Commonwealth v. Brooks,* 576 Pa. 332, 839 A.2d 245 (2003), the decision is best understood from the frame of reference that it was rendered in the midst of an essential upheaval in this Court's death-penalty jurisprudence. There was a strong and largely-prevailing current on the Court favoring stricter enforcement of waiver principles and a bolstering of the prejudice requirement attending claims of deficient stewardship. The circumstances produced landmark decisions such as *Commonwealth v. Grant,* 572 Pa. 48, 67, 813 A.2d 726, 738 (2002) (implementing a general rule favoring deferment of claims of ineffective assistance of counsel to post-conviction review); *Freeman,* 573 Pa. at 560–61, 827 A.2d at 402 (abolishing the general application of the relaxed waiver doctrine in capital cases); and *Commonwealth v. McGill,* 574 Pa. 574, 587–90, 832 A.2d 1014, 1022–23 (2003) (tightening the requirements for issue presentation relative to claims of deficient stewardship). *Brooks,* I believe, should be seen as a vestige of an era in which Justices had greater freedom to

look down on a record and recognize prejudice from a defense lawyer's failure to prepare in a capital case, where such prejudice was palpable.

Finally, I remain deeply disturbed by the lack of competent representation in *Brooks* and by the many other similar and analogous instances we have seen in death-penalty cases before and after *Brooks*. *See generally Commonwealth v. King*, 618 Pa. 405, 447–57, 57 A.3d 607, 633–39 (2012) (Saylor, J., concurring specially) (collecting cases). I also am of the belief that justice would be best served by acknowledging that the prejudice bar should not be so rigidly applied in the face of the accumulating evidence of pervasive deficiencies. *See id.*

Justice EAKIN, concurring.

I join the majority; however, I write separately to reiterate my disfavor of a rule evaluating counsel's performance which applies only to capital defendants. *See Commonwealth v. Brooks*, 576 Pa. 332, 839 A.2d 245, 255–56 (2003) (Eakin, J., concurring). This case, and future failure-to-meet cases, may be properly analyzed under the long-standing framework announced in *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973, 975–76 (1987); therefore, it is unnecessary to afford capital defendants—based solely on their status as a capital defendant—the ability to bypass the requirement of demonstrating actual prejudice. *See Brooks*, at 255 (Eakin, J., concurring) ("[T]he constitution does not afford some lesser right to effective counsel on those charged with noncapital crimes. The right to counsel inures to the capital defendant, the felon, and the misdemeanant alike."). Thus, I agree with the majority that appellee failed to demonstrate he was prejudiced by counsel's failure to meet with him face-to-face prior to trial. However, to the extent the majority would "save for another day the issue of whether, in a post-*Brooks* case, a new trial would be warranted [in a similar factual scenario,]" Majority Op. at 263 n.6, 80 A.3d at 431 n.6, I would analyze that case based solely on the defendant's ability to demonstrate actual prejudice under *Pierce* and its progeny.